AARON BLOCK, ESQ.*
MAX MARKS, ESQ.*
**THE BLOCK FIRM LLC**
309 East Paces Ferry Road, Suite 400
Telephone: (404) 997-8419
aaron@blockfirmllc.com
max.marks@blockfirmllc.com

ROSHAN D. SHAH, ESQ.
**ANDERSON & SHAH, LLC**
ATTORNEYS AT LAW
1040 Broad Street, Suite 304
Shrewsbury, NJ 07702
Telephone: (732) 398-6545
Facsimile: (732) 576-0027
rshah@andersonshahlaw.com
*Attorneys for Plaintiff Sheryl Boyer, on behalf of herself and all others similarly situated*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## NEWARK VICINAGE

| | |
|---|---|
| SHERYL BOYER, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> BRECKENRIDGE PHARMACEUTICAL, INC., <br><br> Defendant. | Hon. Jamel K. Semper, U.S.D.J. <br><br> Civil Action No. 24-6514 (JKS-JBC) <br><br> CIVIL ACTION <br><br> **AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## PRELIMINARY STATEMENT

1.     American patients trust that their medicines will be free of concealed carcinogens. This putative class action arises because the defendant, Breckenridge Pharmaceutical, Inc., broke that trust. Breckenridge has recalled tens of millions of duloxetine pills—a generic version of Cymbalta— because they contained excessive levels of a carcinogen, N-nitroso-duloxetine.

2.     Scientists at Breckenridge's parent company acknowledge that this nitrosamine impurity is "carcinogenic and harmful in duloxetine drug products."[1] But Breckenridge nevertheless sold more than sixty million pills that were unacceptable under the applicable requirements of the Federal Food and Drug Administration ("FDA"), including Current Good Manufacturing Practices ("CGMP") regulations and related standards of the United States Pharmacopeia ("USP"), a pharmaceutical quality standards organization whose work is incorporated into the Food, Drug & Cosmetic Act ("FD&CA"). Breckenridge now admits that these pills were not safe—warranting a Class II recall—due to "CGMP Deviations."[2]

3.     Breckenridge was only able to sell these pills because it misrepresented their quality and purity. Despite its CGMP and USP violations

---

[1] Exhibit 1, Fukuda et al., *Simple and Practical Method for the Quantitative High-Sensitivity Analysis of N-Nitroso Duloxetine in Duloxetine Drug Products Using LC-MS/MS, ACS Omega* (2024).
[2] Exhibit 2, Compiled Enforcement Reports for Recalls Nos. D-0482-2024; D-0483-2024; D-0484-2024; and D-0562-2024.

related to nitrosamine contamination, Breckenridge expressly and falsely labelled its duloxetine pills "USP" on each bottle and in related materials. Further, to have its drug listed as a generic of Cymbalta in the FDA's "Orange Book" and linked to that drug, Breckenridge falsely represented that its generic was therapeutically equivalent, even though it was not due to concealed carcinogens. Breckenridge also warranted to its immediate customers—commercial distributors and pharmacies—that its duloxetine pills complied with CGMP and USP standards, even though its pills did not.

4.      Without these false representations, Breckenridge would not have been able to sell the adulterated pills. Without being listed in the Orange Book and linked to Cymbalta, Breckenridge would have been unable to sell its generic drug in the first instance. Further, prescription drugs that are not USP-compliant would not be accepted by purchasers, prescribers, or pharmacists. Because of these false representations, Breckenridge was able to sell adulterated drugs that were unlawful to sell and economically worthless, and all purchasers in the distribution chain reasonably relied on Breckenridge's representations. Breckenridge never should have sold those pills and is obligated to reimburse patients for their purchases.

## JURISDICTION AND VENUE

5.      The Court has subject-matter jurisdiction under 28 U.S.C. § 1332 (d). Plaintiff is a citizen of Tennessee and Defendant is a citizen of New Jersey

and Delaware. The amount in controversy exceeds $5,000,000.

6.    The Court has personal jurisdiction over Defendant because its headquarters are in New Jersey. *See* Complaint (Doc. 1 ¶ 6), *Breckenridge Pharmaceutical, Inc. v. Hetero USA Inc. et al.*, No. 1:24-cv-00571-UNA (D. Del.) ("Breckenridge is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 200 Connell Drive, Suite 4200, Berkeley Heights, New Jersey 07922."); *accord* Breckenridge Pharmaceutical, Inc., 2023 Florida Profit Corporation Annual Report (April 13, 2023) ("Current Principal Place of Business: 200 Connell Drive, Suite 4200, Berkeley Heights, NJ 07922").

7.    Venue is proper in this District because Defendant is headquartered here and because its conduct giving rise to this case occurred here.

## PARTIES

8.    Sheryl Boyer is a resident of Tennessee and a consumer of Breckenridge's duloxetine drug. On December 18, 2023, Ms. Boyer purchased and her pharmacy dispensed two 90-count bottles of Breckenridge's nitrosamine-contaminated duloxetine with December 2024 expiration dates that were part of recall D-0484-2024 initiated on April 29, 2024.[3] Ms. Boyer

---

[3] *See* Exhibit 2.

paid $5 out-of-pocket for this prescription, with the rest of the cost covered by her health insurance plan. Ms. Boyer was originally prescribed Cymbalta more than twenty years ago, and she relied on the generic duloxetine she purchased being equivalent to what her doctor prescribed in all material respects, including with respect to concealed carcinogens. Ms. Boyer also observed the "USP" designation on the Breckenridge duloxetine she purchased, and it is her understanding that any drug approved by the FDA or USP is considered pharmaceutical grade. Like all other purchasers of prescription medication in the United States, Ms. Boyer reasonably relied on the drugmaker's express representations regarding her prescription medication's quality, purity, and content, and she reasonably relied on her pharmacist's inherent and necessary representation that, by distributing prescription pharmaceuticals to her, the medication she received was what her doctor prescribed and what it purported to be.

9.    Breckenridge is a U.S.-based pharmaceutical company ultimately owned by Towa Pharmaceutical, Inc., a Japanese public company. Breckenridge and its affiliates manufacture and distribute dozens of generic drugs, including duloxetine. Based on the product description in the recall notice published by the FDA, Breckenridge's duloxetine drug was manufactured by "Towa Pharmaceutical Europe, S.L. Martorelles, (Barcelona), Spain" and distributed by "Breckenridge Pharmaceuticals, Inc., Berkeley

Heights, NJ 07922." Based on publicly available information, Breckenridge's leadership team was in and working from the Berkeley Heights headquarters by at least mid-2023, during the distribution and marketing period for the product at issue. As a result, Breckenridge's decision-making and representations regarding duloxetine's purity—and lack thereof—would have been made in and from New Jersey. Specifically, Breckenridge would have made the affirmative misrepresentations and omissions at issue in this case while coordinating the distribution and sale of duloxetine from its New Jersey headquarters. Breckenridge Pharmaceutical Inc., now headquartered in New Jersey, is listed in the Orange Book as the holder of record for the company's duloxetine ANDA, A203088. Breckenridge's interactions with the FDA regarding contamination in duloxetine and the basis and scope of the recalls would have been made from the company's New Jersey headquarters. Breckenridge is coordinating the recalls from its New Jersey headquarters. And Breckenridge's decisions regarding what information to release and when to release it to duloxetine customers and ultimate patients would have been made from the company's New Jersey headquarters.

**FACTUAL ALLEGATIONS**

***Breckenridge's Recall of Nitrosamine Contaminated Duloxetine***

10.    Duloxetine is an SSNRI (serotonin-noradrenaline reuptake inhibitor) marketed for chronic mood symptoms and chronic pain. Duloxetine

is the generic form of Cymbalta, which Breckenridge launched shortly after Cymbalta went off-patent. Duloxetine, including its branded and generic versions, is reportedly the 31st most-prescribed medications in the U.S., with more than 18 million prescriptions annually.[4] Breckenridge's duloxetine appears to be a flagship product for the company.

11.    On or about April 29, 2024, the FDA revealed that Breckenridge was recalling many millions of duloxetine tablets due to "CGMP Deviations: Presence of Nitrosamine Drug Substance Related Impurity (NDSRI), N-nitroso-duloxetine, above the [FDA's] proposed interim limit."[5] According to scientists from Breckenridge's parent company, Towa Pharmaceutical, this nitrosamine impurity is "carcinogenic and harmful in duloxetine drug products."[6]

12.    To date, Breckenridge has been forced to undertake four related recalls covering at least 69,184,749 pills contaminated with carcinogenic nitrosamines: D-0482-2024 (281,554 X 90/1000-count bottles); D-0483-2024 (7,188 X 500-count bottles); D-0484-2024 (281,554 X 90-count bottles); and D-0562-2024 (165,678 X 90-count bottles). The true number of affected pills is higher because the estimate above assumes all 281,554 bottles in recall D-

---

[4] Exhibit 3, ClinCalc.com, Duloxetine, Drug Usage Statistics, United States, 2013–2022.
[5] Exhibit 2.
[6] Exhibit 1.

0482-2024 were 90-count, even though some number, known to Breckenridge but which the company has not made public, were 1,000-count bottles.

### Background on Nitrosamine Contamination

13.    The acknowledgement of Breckenridge's scientists that nitrosamine impurities in drugs are "carcinogenic and harmful" is a statement of established science, not a novel conclusion of their study, which aimed to describe testing methods for N-nitroso-duloxetine in finished products. As the World Health Organization ("WHO") explained in 2019, "[n]itrosamines, or more correctly N-nitrosamines, refer to any molecule containing the nitroso functional group."[7] As is apparent from its name, N-nitroso-duloxetine is a molecule containing the nitroso functional group and is in the family of nitrosamines.

14.    Drug regulators and testing authorities have long recognized that nitrosamines are "high potency mutagenic carcinogens."[8] As the USP explains, despite the background presence of "some level of nitrosamines" in the environment, "their presence in medicine, even at trace level[,] poses high safety risks to patients because Nitrosamine impurities are probable human

---

[7] Exhibit 4, World Health Organization, *Information Note: Update on Nitrosamine Impurities* (Nov. 20, 2019).
[8] *See, e.g.*, Exhibit 5, International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use, *Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals to Limit Potential Carcinogenic Risk, M7(R2)* (April 3, 2023); Exhibit 6, FDA, *M7(R2) Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals to Limit Potential Carcinogenic Risk, Guidance for Industry* (July 2023).

carcinogens."[9] The WHO agrees; "[a]though they are also present in some foods and drinking water supplies, their presence in medicines is nonetheless considered unacceptable."[10]

15.   Nitrosamine contamination has been a major focus of regulators worldwide since at least 2018, as they have rushed to identify and address an unexpectedly large number of drugmakers who have been manufacturing and distributing an unexpectedly broad range of drugs with nitrosamine contamination. As reflected by the history below, when the FDA and other regulators identify nitrosamine contamination, the baseline approach is to recall the adulterated drug *unless* the agency has published acceptable intake ("AI") limits or other guidelines that identify an acceptable level of the specific nitrosamine impurity under which the agency will not take action. In other words, the operating assumption before the FDA publishes AIs applicable to a specific nitrosamine is that nitrosamine contamination is unsafe and unacceptable—not that the nitrosamine impurity without published AIs is safe and acceptable without limit in medication distributed to patients.

16.   On July 5, 2018, the international crackdown on nitrosamine contamination began when the European Medicines Agency ("EMA") announced an EU-wide recall of all blood pressure medicine "containing the

---

[9] Exhibit 7, USP, General Chapter <1469> Nitrosamine Impurities.
[10] Exhibit 4.

active substance valsartan that is supplied by Zhejiang Huahai Pharmaceuticals" due to the detection of "an impurity, N-nitrosodimethylamine."[11] The presence of this "probable human carcinogen" was "unexpected," but the EMA nevertheless issued a full recall "[w]hile the review is underway."

17. On July 17, 2018, the FDA followed suit, announcing a recall of these nitrosamine contaminated drugs.[12] The FDA reiterated its commitment "to maintaining our gold standard for safety and efficacy" and identified the situation as one involving "lapses in the quality of drugs and problems with their manufacturing that have the potential to create risks to patients," justifying "swift action to alert the public and help facilitate the removal of the products from the market."[13] The FDA further reiterated that the nitrosamine contaminated valsartan "does not meet our safety standards," requiring "immediate action to protect patients." In addition to this regulatory action, this initial incident of nitrosamine contamination and related recalls led to the *In re Valsartan* litigation that continues to this day, with various claims of multiple different certified classes surviving summary judgment against a broad array of defendants globally across the distribution chain, among other

---

[11] Exhibit 8.
[12] Exhibit 9.
[13] *Id.*

lawsuits involving nitrosamine contamination that have proceeded into discovery in this District and before other courts.

18.    As explained by the WHO in its November 20, 2019, Update on Nitrosamine Impurities, "nitrosamine impurities were subsequently detected in other medicines belonging to the sartan family, including: N-nitrosodiethylamine (NDEA), N-nitrosodiisopropylamine (NDIPA), N-nitrosoethylisopropylamine (NEIPA) and N-nitroso-N-methyl-4-aminobutyric acid (NMBA)" as well as "in pioglitazone and ranitidine containing products."[14] By that point, regulators had "broader concerns" regarding "nitrosamine formation" through "additional mechanisms," and the EMA ordered all drugmakers within its jurisdiction—including the Spain-based Towa subsidiary that manufactured the duloxetine at issue—to "conduct [a] risk assessment to determine the risk of nitrosamine content."

19.    The WHO's 2019 update also summarized the interim AI limits adopted through that point. For five nitrosamines where regulators had sufficient "impurity-specific toxicity data," the WHO published AIs of between 26.5 and 96.0 ng/day. "For a nitrosamine impurity that is not included" among those five, "the principles outlined in ICH's M7(R1) guideline are recommended to be used to determine an acceptable intake." "Batches of product exceeding

---

[14] Exhibit 4.

these limits for an individual impurity, or batches containing both NDMA and NDEA are not allowed in the EU."

20.    On September 3, 2020, the FDA published the first iteration of its comprehensive Control of Nitrosamine Impurities in Human Drugs Guidance for Industry ("Nitrosamine Guidance").[15] The FDA explained that the "unexpected finding of nitrosamine impurities, which are probable human carcinogens, in drugs . . . has made the clear the need for a risk assessment strategy for potential nitrosamines in any pharmaceutical product at risk for their presence," and the FDA was therefore recommending "steps manufacturers of APIs and drug products should take to detect and prevent unacceptable levels of nitrosamine impurities in pharmaceutical products."[16]

21.    As the agency explained in the background section of the Nitrosamine Guidance, the FDA's "investigat[ion] [into] the presence of nitrosamine impurities in certain drug products" had already led to several major recalls as the agency identified "drug products from different manufacturers [that] contained unacceptable levels of nitrosamines."[17] These recalls included "all ranitidine products" due to the risk that nitrosamine impurities in "products stored at room temperature can increase with time to

---

[15] Exhibit 10

[16] *Id.* at 1 (page citations refer to the numbered pages at the bottom of the document).

[17] *Id.* at 2–3; *see also generally* Exhibit 11, FDA, *Information About Nitrosamine Impurities in Medications* (Sept. 4, 2024).

unacceptable levels."[18] The FDA also noted the close international collaboration on this issue: "Because the nitrosamine impurity issue extends beyond the U.S. drug supply, FDA and other regulatory authorities have partnered to share information, coordinate inspection efforts, communicate effective analytical methods to detect and identify variously nitrosamines, and to develop rapid solutions to ensure the safety and quality of the drug supply."[19]

22.    As part of its 2020 Nitrosamine Guidance, the FDA adopted AI limits for six specific nitrosamine impurities: NDMA, NDEA, NMBA, NMPA, NIPEA, and NDIPA.[20] But the agency did not suggest that unlisted nitrosamine impurities—including N-nitroso-duloxetine or NDLX—would be acceptable without limit. Quite the opposite. "If nitrosamines without published AI limits are found in drug products, manufacturers should use the approach outlined in ICH M7(R1) to determine the risk associated with the nitrosamine and contact the Agency about the acceptability of any proposed limit."[21] In other words, there was no assumption that unlisted nitrosamines were acceptable in *any* amount; instead, the FDA expected manufacturers to come to it for approval of any proposed limits if new sources or types of

---

[18] Exhibit 10 at 3.
[19] *Id.* at 3.
[20] *Id.* at 10 and Table 1.
[21] *Id.* at 10.

nitrosamine contamination were discovered as part of required purity diligence the Agency expected drugmakers to be undertaking.

23.    The other aspects of the FDA's 2020 Nitrosamine Guidance also expressly were not limited to the six specific nitrosamine impurities that already had internationally recognized AI limits. "Although nitrosamine impurities have been found in only some drug products, and batches of those products have been recalled when there were unacceptable levels of these impurities, nitrosamine impurities might exist in other APIs and drug products due to use of vulnerable processes and materials that may produce nitrosamine impurities. Therefore, the recommendations made in this guidance apply to all chemically synthesized APIs. They also apply to drug products containing chemically synthesized APIs and to drug products at risk due to other factors described in this guidance . . . and not just to the drug products that have been identified in FDA announcements."[22]

24.    As the agency explained in 2020, "[n]itrosamine compounds are potent genotoxic agents in several animal species and some are classified as probable or possible human carcinogens by the International Agency for Research on Cancer (IARC)," and "[t]hey are referred to as 'cohort of concern' compounds in the ICH guidance for industry *M7(R1) Assessment and Control*

---

[22] *Id.* at 2.

*of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals To Limit Potential Carcinogenic Risk* (March 2018)."[23]

25. Consequently, the agency "recommends control of any known mutagenic carcinogen, such as nitroso-compounds, at or below a level such that there would be a negligible human cancer risk associated with the exposure to potentially mutagenic impurities."[24] "Because nitrosamines are probable or possible human carcinogens, FDA recommends that manufacturers consider the potential causes of nitrosamine formation described in this guidance as well as any other pathways observed and evaluate the risk for nitrosamine contamination or formation in their APIs and drug products."[25]

26. The FDA also made clear in 2020 that nitrosamine control is a matter of CGMP compliance. "To meet the CGMP regulations in 21 CFR 211 subpart E and be consistent with the ICH guidance for industry *Q10 Pharmaceutical Quality System* (April 2009), drug product manufacturers should continue testing API lots until they have verified that the API supplier can consistently manufacture API without unacceptable levels of nitrosamine."[26] Further, "[g]iven existing uncertainties regarding nitrosamine impurities and their presence in drugs, testing of each batch on release should

---

[23] *Id.* at 5.
[24] *Id.*
[25] *Id.* at 9.
[26] *Id.* at 14–15.

be conducted. . . . Any drug product batch found to contain levels of nitrosamine impurities at or above the recommended AI should not be released by the drug product manufacturer. . . . Under section 501 of the [FD&CA], a drug that is not manufactured, processed, packed, or held in conformity with CGMP to ensure that the drug meets certain quality and purity standards is considered adulterated."[27]

27.    For approved or marketed drug products, the FDA instructed that, "[t]o ensure the safety of the U.S. drug supply, manufacturers should conclude a risk assessment of approved or marketed products *within 6 months* of publication of this guidance. Confirmatory testing should start as soon as the risk of nitrosamine is identified from the risk assessment and should begin immediately for products considered at high risk."[28] After listening to industry feedback, FDA updated this risk assessment completion deadline to "*within 7 months* of publication of the original guidance, with a recommended date of on or before March 31, 2021."[29]

28.    FDA finalized its guidance in September 2024, leaving in place the expectation of nitrosamine control. *See Control of Nitrosamine Impurities in Human Drugs: Guidance for Industry* (September 2024).[30] Although styled as

---

[27] *Id.* at 15.
[28] *Id.* at 17.
[29] Exhibit 12, FDA, "Revision 1" to the *Control of Nitrosamine Impurities in Human Drugs, Guidance for Industry* (Feb. 25, 2021).
[30] Exhibit 13.

"containing nonbinding recommendations," compliance is not optional because non-compliant drugs are adulterated for failure to conform with underlying CGMP and USP requirements and therefore illegal to sell. "Generally, any drug product batch found to contain levels of a nitrosamine impurity above the FDA recommended AI limits should not be released by the drug product manufacturer for distribution and may warrant removal from the market, because such drug products may be considered adulterated under section 501 of the [FD&CA], for example if they are not manufactured, processed, packed, or held in conformity with CGMP. As discussed further below, FDA may exercise enforcement discretion when warranted to prevent or mitigate a shortage of a drug." *Id*. at 19.

29.    After FDA issued its first guidance, other regulators worldwide followed suit. On October 8, 2021, the Japanese Ministry of Health, Labor and Welfare—the regulatory agency with jurisdiction over Breckenridge's parent company, Towa Pharmaceutical—published a guidance document titled *Self-inspection on Risks of Contamination with Nitrosamines in Drugs*.[31] In it, the agency stated that "nitrosamines, which are carcinogens, have been detected in some sartan drugs, ranitidine, nizatdine, metformin, etc. in Japan and overseas, and some products have been recalled," and it directed drugmakers

---

[31] Exhibit 14.

under its "jurisdiction to conduct self-inspection on risks of contamination with nitrosamines."

30.     Reflecting the urgency with which regulators worldwide were endeavoring to address the expanding nitrosamine contamination crisis, the Japanese agency's publication now included specific AIs ranging from 26.5–127 ng/day for nine listed nitrosamine impurities: NDMA, NDEA, NMBA, NMPA, NIPEA, NDIPA, MeNP, NDBA, and NMOR. But like the FDA's Nitrosamine Guidance, the Japanese agency expressly did not limit its scope to those nine impurities. Rather, the agency instructed that, "[w]hen a single new nitrosamine is identified[,] [t]he limits should be set in a scientifically valid manner, such as by setting limits assuming lifetime exposure with reference to ICH M7 (R1) when carcinogenicity study data using rodents are available, or by setting limits based on structure-activity relationships or genotoxicity study when carcinogenicity study data are not available."[32]

31.     On October 10, 2022, the EMA published specific AI limits of 100 ng/day for the nitrosamine impurity at issue in this case, N-nitroso-duloxetine, as part of the twelfth revision to the agency's official *Questions and answers for marketing authorization holders/applicants on the CHMP Opinion for the Article 5(3) of Regulation (EC) No 726/2004 referral on nitrosamine impurities*

---

[32] *Id.* at 2.

*in human medicinal products*, EMA/409815/2020.[33] As reflected in the notes to Appendix A, where the EMA published its AI for N-nitroso-duloxetine, the "[l]imit [was] derived using structure-activity-relationship (SAR)/read-across approach using the TD50 of NNK as point of departure as substance tested positive in *in vivo* mutagenicity study."[34] The EEA's note appears to reflect that this was a carcinogenicity study using rodents—a method approved by the *ICH M7 (R1)* guidance adopted by the FDA for nitrosamine impurities without published AIs—and the results were positive for cancer risk, with results representative of the highly studied and highly toxic nitrosamine impurity 4-(methylnitrosamino)-1-(3-pyridyl)-1-(butanone) (NNK).

32.    On August 4, 2023, the FDA published *Recommended Acceptable Intake Limits for Nitrosamine Drug Substance-Related Impurities (NDSRIs), Guidance for Industry*, through which the agency formally adopted the same 100 ng/day AI limit for N-nitroso-duloxetine as the EMA.[35] "NDSRIs are a class of nitrosamine impurities that have been identified in many drug products and also could be present in active pharmaceutical ingredients (APIs)" that "share structural similarity to the API (having the API or API fragment in the chemical structure) and are therefore unique to each API."[36] The agency's

---

[33] Exhibit 15 (current Rev. 21 identifying the October 10, 2022, Rev. 12 as including an "[u]pdate of Q&A 10 to add nitrosoduloxetine").
[34] Exhibit 16, Appendix A to the prior exhibit, linked at Q&A 10.
[35] Exhibit 17 at 1.
[36] *Id.*

NDSRI "guidance recommends a risk-based safety assessment of NDSRIs and can be used by manufacturers and applicants to identify AI limits for NDSRIs in their drug products and APIs in conjunction with the recommendations in the guidance for industry *Control of Nitrosamine Impurities in Human Drugs* (February 2021) (Nitrosamine Guidance)."[37]

33.    The FDA's August 2023 publication emphasizes that the underlying concerns and background set out in the Nitrosamine Guidance also apply to NDSRIs. "As explained in the Nitrosamine Guidance, manufacturers of APIs and drug products should take appropriate measures to prevent unacceptable levels of nitrosamines impurities in their drug products. Because nitrosamine compounds have the potential to be potent genotoxic agents in several animal species and some are classified as probable or possible human carcinogens, they are included in a group of high potency mutagenic carcinogens referred to as *cohort of concern* compounds in the ICH guidance for industry *M7(R2) Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals to Limit Potential Carcinogenic Risk* (July 2023) (ICH M7(R2)). The ICH M7(R2) guidance provides recommendations on control of any known or potential mutagenic carcinogens, such as nitroso-compounds at or below a level associated with negligible human cancer risk associated

---

[37] *Id.* at 2.

with exposure to these impurities."[38]

34.    Consistent with the EMA's approach when establishing a 100 ng/day AI for N-nitroso-duloxetine in 2022, the FDAs recommended approach "is based on principles of ICH M7(R2) that recommend the use of structure-activity relationship (SAR) concepts to assess and classify the mutagenic and carcinogenic risk of impurities to limit potential carcinogenic risk in drug products. The science on structure-activity relationships of *N*-nitroso compounds has progressed, so that at this time, FDA recommends that this predictive methodology be used to assess the carcinogenic potency of NDSRIs and more accurately predict their mutagenic potential." As in the study cited in the EEA's notes, the FDA recommended that "[a] compound-specific AI can be calculated based on rodent carcinogenic potency data such as TD50 values (dosages giving a 50 percent tumor incidence equivalent to a cancer risk probability level of 1:2) identified in the published scientific literature."[39]

35.    The FDA recommended five AI categories for NDSRIs based on "the predicted carcinogenic potency" of the impurity. For impurities with a 100 ng/day limit, the limit "is representative of two potent, robustly tested nitrosamines, *N*-nitrosodimethylamine (NDMA) and 4-(methylnitrosamino)-1-(3-pyridyl)-1-(butanone) (NNK), which have recommended AI limits of 96

---

[38] *Id.* at 4.
[39] *Id.* at 5.

ng/day and 100 ng/day, respectively." In other words, these "Category 2" NDSRIs are equivalent in the FDA's view to the NDMA impurity that led to the initial worldwide valsartan recalls starting in July 2018.

36. Applying this approach, the FDA identified N-nitroso-duloxetine as a "Category 2" NDSRI with a 100 ng/day limit—the same AI that the EMA had established the prior year.[40] On April 18, 2024, due to drug shortages, the FDA temporarily relaxed this AI to 600 ng/day, through October 1, 2024.[41]

37. Because the recall of the drugs at issue was announced on April 29, 2024—after the adoption of this temporarily relaxed AI—the FDA's recall announcement indicates Breckenridge's pills were contaminated beyond the 600 ng/day level and, therefore, many times beyond the 100 ng/day level that applied before April 18, 2024.

### *Prescription Drugs that Do Not Comply with Nitrosamine Acceptable Intake Limits are Adulterated and Nonsaleable*

38. In addition to the foregoing, the FDA and related organizations and agencies have elsewhere made clear to the pharmaceutical industry that drugs that do not comply with nitrosamine AIs are adulterated and nonsaleable under the FD&CA. This section provides some non-exclusive examples of regulatory comments and actions focusing on the need to comply

---

[40] Exhibit 18.
[41] *Id.*

with the FDA's AI limits.

39.     Soon after the FDA published its original Nitrosamine Guidance, the USP submitted an official regulatory comment to "commend FDA on the issuance of [FDA] guidance to help drug product and active pharmaceutical ingredient (API) manufacturers detect and prevent unacceptable levels of nitrosamine impurities in pharmaceutical products. USP supports the Agency's efforts to minimize the public health risk caused by the presence of these potential carcinogenic impurities." USP, Comment (Nov. 10, 2020), Docket No. FDA-2020-D-1530, Control of Nitrosamine Impurities in Human Drugs: Guidance for Industry.

40.     On July 2, 2021, the FDA announced a recall of Pfizer's drug Chantix "because it may contain levels of a nitrosamine impurity, called N-nitroso-varenicline, above FDA's acceptable intake limit."[42] At the time of this recall, N-nitroso-varenicline was not among the nitrosamine impurities with a specific AI limit identified in the most recent Nitrosamine Guidance, the February 2021 Revision 1. Rather, N-nitroso-varenicline is an NDSRI that the FDA now categorizes as "Category 3" with an AI of 400 ng/day.[43] "Compared to Potency Category 2, NDSRIs in this category have lower carcinogenic potency

---

[42] Exhibit 20 (FDA webpage summarizing the chronology and linking to various documents related to the Chantix nitrosamine recall and related regulatory action).
[43] Exhibit 18 (search result for N-nitroso-varenicline in Table 1).

due to, for example, the presence of a weakly deactivating structural feature. The recommended AI limit was set to reflect a 4-fold decrease in carcinogenic potency from Category 2."[44] In other words, N-nitroso-varenicline is four times less carcinogenic than the N-nitroso-duloxetine at issue in this case. Yet, as reflected by the extensive recall history and discussed further below, the presence of this nitrosamine impurity resulted in extensive regulatory action and even put Chantix's listing in the Orange Book at risk.[45]

41.     On February 27, 2023, FDA published in the Federal Register a Formal Determination regarding Chantix's continued status as a brand name drug listed in the Orange Book. *See* 88 Fed. Reg. 12384 (Feb. 27, 2023).[46] In that Determination, FDA found that Chantix should not be "withdrawn from sale for reasons of safety or effectiveness *to the extent that the drug can be manufactured or formulated in a manner that satisfies any applicable acceptable intake limit for nitrosamine impurities*." *Id.* at 12385. Accordingly, because Chantix could be made in compliance with "applicable intake limit[s] for nitrosamine impurities," the FDA determined that it could continue to remain active in the Orange Book and serve as a predicate for subsequent generic ANDAs. By contrast, drugs that do not so comply are adulterated and

---

[44] Exhibit 17
[45] Exhibit 20.
[46] Exhibit 21.

unlawful to sell.

42.     In a May 2023 Federal Register Notice, the FDA similarly notified drugmakers that "[o]nce a recommended AI limit has been established, applicants and manufacturers would generally be expected to control impurities within the recommended AI limit." 88 Fed. Reg. 28557, 28560 (May 4, 2023) (citing FDA, *Control of Nitrosamine Impurities in Human Drugs, Guidance for Industry* (Feb. 2021)).[47]

43.     In addition to these official regulatory actions and statements, in early 2023, senior scientists from the FDA and peer agencies in Canada, the European Union, Singapore, Brazil, and Germany published a paper entitled *Regulatory Experiences with Root Causes and Risk Factors for Nitrosamine Impurities in Pharmaceuticals*. Horne et al., Journal of Pharmaceutical Sciences (2023).[48] The paper explained that "manufacturers are expected to demonstrate sufficient understanding of manufacturing processes and to establish appropriate control strategies to ensure that nitrosamine impurities are routinely below AI limits for patients." As is customary, the paper carries the caveat that it expresses the views of the authors, not necessarily that of their respective agencies, but it is implausible that their consensus characterization of their agencies' expectations is incorrect.

---

[47] Exhibit 22.
[48] Exhibit 23.

44.     In short, it has been understood for years that compliance with AI limits is not optional; non-compliant drugs are adulterated, cannot lawfully be sold, and would not knowingly be purchased.

### *Breckenridge Failed to Comply with CGMP and USP Requirements, Rendering its Duloxetine Adulterated and Nonsaleable*

45.     According to the FDA, "[c]onsumers expect that each batch of medicines they take will meet quality standards so that they will be safe and effective."[49] Because consumers "usually cannot detect (through smell, touch, or sight) that a drug product is safe or if it will work," drugmaking must be closely regulated to keep consumers safe.[50] To that end, the FD&CA and related CGMP regulations and USP standards set multiple requirements to ensure that medicines are safely made and are what drug-makers say they are. *See, e.g.*, 21 U.S.C. § 351 *et seq.* (requiring drugs to comply with USP specifications); 21 C.F.R.  Parts 210–211 (CGMP regulations). When "a company is not complying with CGMP regulations, any drug it makes is considered 'adulterated' under the law" and is unlawful to sell.[51] 21 U.S.C. § 331 ("prohibit[ing]" the sale of "adulterated" drugs); 21 U.S.C. § 351(a)(2)(B) and (b) (providing that drugs that fail to meet USP or CGMP requirements are "adulterated"); 21 U.S.C. § 333 (knowing violations of the FD&CA a felony).

---

[49] Exhibit 24, FDA, *Facts About the Current Good Manufacturing Practices (CGMPs)* (Feb. 16, 2024).

[50] *Id.*

[51] *Id.*

These requirements are broadly incorporated into parallel state laws.

46.     Under CGMP regulations, every drugmaker is required to have a "quality control unit that shall have the responsibility and authority to approve or reject all components, drug product containers, closures, in-process materials, packaging material, labeling, and drug products, and the authority to review production records to assure that no errors have occurred or, if errors have occurred, that they have been fully investigated." 21 C.F.R. § 211.22(a). "The quality control unit shall have the responsibility for approving or rejecting all procedures or specifications impacting on the identity, strength, quality, and purity of the drug product." *Id.* at (b). Among its other duties, "[t]he establishment of any specifications, standards, sampling plans, test procedures, or other laboratory control mechanisms required by [the Laboratory Controls] subpart, including any change in such specifications, standards, sampling plans, test procedures, or other laboratory control mechanisms, shall be drafted by the appropriate organizational unit and reviewed and approved by the quality control unit." 21 C.F.R. § 211.160(a).

47.     It is the drugmaker's responsibility to ensure that its drugs are of the required quality and purity. "Laboratory controls shall include the establishment of scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, in-process materials, labeling,

and drug products conform to appropriate standards of identity, strength, quality, and purity." 21 C.F.R. § 211.160(b).

48.    Under the CGMP regulations, the drugmaker must ensure the necessary purity, strength, and quality of its drugs through all phases of production and throughout the drug's lifecycle. With respect to components sourced from third parties, the "component shall be tested for conformity with all appropriate written specifications for purity, strength, and quality." 21 C.F.R. § 211.84(d)(2). Then, as drugs are being made, "[i]n-process materials shall be tested for identity, strength, quality, and purity as appropriate, and approved or rejected by the quality control unit, during the production process, e.g., at commencement or completion of significant phases or after storage for long periods." 21 C.F.R. § 211.110(c). Before release, "[f]or each batch of drug product, there shall be appropriate laboratory determination of satisfactory conformance to final specifications for the drug product." 21 C.F.R. § 211.165(a). Finally, "[t]o assure that a drug product meets applicable standards of identity, strength, quality, and purity at the time of use, it shall bear an expiration date determined by appropriate stability testing described in § 211.166." 21 C.F.R. § 211.137(a).

49.    With respect to required pre-release testing, "[a]cceptance criteria for the sampling and testing conducted by the quality control unit shall be adequate to assure that batches of drug products meet each appropriate

specification and appropriate statistical quality control criteria as a condition for their approval and release. The statistical quality control criteria shall include appropriate acceptance levels and/or appropriate rejection levels." 21 C.F.R. § 211.165(d).

50.    In addition to having its own force and effect via incorporation into the FD&CA, the USP expressly adopts the FDA's CGMP regulations with respect to all its monographs. The USP's General Notices and Requirements, which apply to all compendial drugs, expect compliance "at all times in the life of the article from production to expiration."[52] According to these general notices, "[o]fficial products are prepared according to recognized principles of good manufacturing practice." Further, under Section 5.60, Impurities and Foreign Substances: "Tests for the presence of impurities and foreign substances are provided to limit such substances to amounts that are unobjectionable under conditions in which the article is customarily employed. . . . Nonmonograph tests and acceptance criteria suitable for detecting and controlling impurities that may result from a change in the processing methods or that may be introduced from external sources should be employed in addition to the tests provided in the individual monograph, where the presence of the impurity is inconsistent with applicable good manufacturing practices

---

[52] Exhibit 25.

or good pharmaceutical practices."

51.     As the USP explains, "[e]levated levels of nitrosamines" in medications "pose a risk of physical harm to patients and can undermine trust in medicine quality, harming patients who may be reluctant to take the medicines they need to stay healthy."[53] Through published standards and guidance, USP offers tools for drugmakers to ensure compliance with the pertinent CGMP requirements. For instance, USP has promulgated testing methods and reference standards for nitrosamine detection and purity analyses, including USP General Chapter <1469> Nitrosamine Impurities.[54]

52.     Similarly, under USP <476> Control of Organic Impurities in Drug Substances and Drug Products, "[m]anufacturers shall validate or verify, as appropriate, analytical procedures and must demonstrate their suitability for the detection and quantitation of impurities in drug substances and drug products. Manufacturers shall develop acceptance criteria for impurities that are justified by appropriate safety considerations and consistent with current applicable regulatory guidances."[55] Further, "[f]or impurities known or suspected to be unusually toxic (e.g., mutagenic impurities)"—such as nitrosamines—"the limit of detection and limit of quantitation of the analytical

---

[53] *See*, *e.g.*, Exhibit 26, USP, *Nitrosamine Impurities*
[54] *Id.*; *see also* Exhibit 7.
[55] Exhibit 27.

procedures shall be commensurate with the acceptance criteria and the current applicable regulatory guidances to ensure patient safety." Whether using the methods in those chapters or other reliable means, USP's general chapter (and understood premise) is that drugs will comply with good manufacturing practices, including AI limits.

53.    As the FDA explains, "a decision to release lots remains solely the firm's responsibility. Firms are responsible for ensuring that their drugs are manufactured in compliance with all applicable requirements, including CGMP, and FDA expects them to vigilantly monitor and promptly report to FDA any adverse drug experiences or other findings that may affect product safety or quality."[56] Further, "with respect to FDA-recommended interim control limits, FDA generally does not intend to object to the distribution by manufacturers and applicants of drug products that contain [nitrosamine] levels *at or below* the recommended interim control limit."[57]

54.    Breckenridge failed to meet the CGMP and USP requirements cited above. While discovery is necessary to determine exactly how and why it failed, there is no question that the company failed to adopt adequate quality controls, testing, and acceptance criteria to ensure that its duloxetine met the required quality and purity standards to ensure patient safety. Specifically,

---

[56] Exhibit 18.
[57] *Id.*

Breckenridge failed to control for, detect, and adopt appropriate acceptance criteria with respect to nitrosamine impurities.

55.    Before the FDA adopted a specific AI limit for N-nitroso-duloxetine on August 3, 2023, Breckenridge failed to comply with its obligations under the CGMP regulations, USP standards, and the FDA's published Nitrosamine Guidance. At least as early as the 2020 Nitrosamine Guidance—if not earlier via the nitrosamine-related recalls—the FDA had made it clear to drugmakers that it expected them to implement processes necessary to "control [] any known mutagenic carcinogen, such as nitroso-compounds, at or below a level such that there would be a negligible human cancer risk associated with the exposure to potentially mutagenic impurities."[58] Further, under the Nitrosamine Guidance, "[i]f nitrosamines without published AI limits are found in drug products, manufacturers should use the approach outlined in ICH M7(R1) to determine the risk associated with the nitrosamine and contact the Agency about the acceptability of any proposed limit."[59]

56.    Well before August 2023—through rodent studies in 2022, if not earlier—it had already been scientifically determined that N-nitroso-duloxetine was a "known mutagenic carcinogen." Breckenridge was therefore obligated under the Nitrosamine Guidance—as well as the underlying CGMP

---

[58] Exhibit 10 at 5.
[59] *Id.* at 10.

regulations and related USP standards—to adopt acceptance criteria and other quality control procedures necessary to ensure that the N-nitroso-duloxetine in its drugs remained "at or below a level such that there would be a negligible human cancer risk associated with the exposure to potentially mutagenic impurities,"[60] with reference to "the approach outlined in ICH M7(R1)."[61]

57.     Although not expressly adopted by the FDA until 2023, the EMA's adoption of a 100 ng/day AI limit in 2022 is instructive. As explained above, the EMA set its AI limit according to the ICH M7 (R1) guidance—the same guidance expressly adopted by the FDA in the Nitrosamine Guidance (as well as European and Japanese authorities) for determining appropriate AIs for nitrosamine impurities without established limits. The EMA based its AI limit on a live rodent study—a gold standard methodology with international scientific acceptance. While the EMA's AI limits are, of course, not binding on US drug sales, the agency's adoption of the AIs illustrates the extent to which knowledge of the danger of N-nitroso-duloxetine had advanced. Independent of the EMA's regulatory decision, the underlying CGMP regulations, related USP standards, and the Nitrosamine Guidance all required Breckenridge to ensure the quality, purity, and safety of its drugs. Breckenridge failed to do so.

58.     The claims of Plaintiff and the Class encompass all sales of

---

[60] *Id.* at 5.
[61] *Id.* at 10.

Breckenridge's adulterated duloxetine that the company knowingly or recklessly sold despite its failure to comply with applicable CGMP or USP requirements for nitrosamine impurities, as shown by discovery; the claims are not necessarily limited to the period after which the FDA published specific AI limits for N-nitroso-duloxetine. But, when the FDA published its own AI limits on August 3, 2023, there is no question that drugs that failed to meet them—and later the relaxed drug supply emergency limits for the period in which they were approved and apply—were adulterated. Breckenridge has essentially conceded as much by issuing a Class II recall based on "CGMP Deviations: Presence of Nitrosamine Drug Substance Related Impurity (NDSRI), N-nitroso-duloxetine, above the [FDA's] proposed interim limit."[62]

### The Marketplace, Including Consumers, Relied on Breckenridge's False Representations Regarding CGMP and USP Compliance

59.    Breckenridge used a variety of false representations to sell its adulterated duloxetine. Through its Orange Book listing, Breckenridge affirmatively represented that its adulterated duloxetine was therapeutically equivalent to Cymbalta and therefore free of unacceptable nitrosamine contamination, when it was not. Breckenridge expressly represented to everyone in the distribution chain, including consumers, that its adulterated duloxetine was USP-complaint in the name of the drug, on the bottle, and on

---

[62] Exhibit 2.

marketing materials—"Duloxetine Delayed-release Capsules, USP"[63]—even though the pills were not compliant. Breckenridge expressly represented to its commercial customers via written contracts that its adulterated duloxetine complied with all applicable regulatory requirements, when it did not. The very nature of Breckenridge's sale of its adulterated duloxetine through the US pharmaceutical system carried with it the inherent representation that the drugs were made according to CGMP and other FD&CA requirements, when they were not. And Breckenridge failed to disclose to all of those who assumed the company was complying with the applicable nitrosamine testing and release standards that it was not doing so.

60.    Breckenridge's false representations and omissions were material; without them, Breckenridge could not have sold its adulterated duloxetine. Distributors, pharmacies, and pharmacists do not trade in USP-listed drugs that are not USP compliant and that do not comply with FDA standards. Patients, as well as the physicians who prescribe drugs and the pharmacies who dispense them, expect drugmakers like Breckenridge to comply with CGMP, USP, and other FDA standards to keep drugs free of unacceptable levels of nitrosamine contamination. That expectation is a function of law, industry practice, and social norms all down the chain of distribution.

---

[63] *See, e.g.*, Exhibit 28, Breckenridge, Medication Guide, Duloxetine Delayed-release Capsules, USP.

61.     To take another example, generic drugmakers like Breckenridge must also represent to pharmacy "linkage" databases and insurers that their drugs are equivalent to branded drugs (without contamination) to compete for business.[64] Marketing a generic of an approved name-brand drug depends on the drug being listed as therapeutically equivalent to the branded version in the FDA's Orange Book, which requires, *inter alia*, the generic to comply with the "identical compendial [i.e., USP] or other applicable standard of . . . purity" as the branded drug.[65] Absent Orange Book listing, prescribers, dispensers, payers, and patients will not substitute a generic for the branded version or a listed generic. Thus, but for the representation of compliance with the applicable nitrosamine purity standards, Breckenridge could not have sold its drug to downstream patients via the pharmaceutical supply chain.

62.     Physicians, who cannot be expected to test individual drugs, rely on drugmakers to make uncontaminated medicine. And patients, who are even less able to discern drug quality, must rely on drugmakers to make and distribute untainted drugs in the first instance. As the FDA explains, "[c]onsumers expect that each batch of medicines they take will meet quality standards so that they will be safe and effective."[66]

---

[64] *See generally United States Pharm. Corp. v. Trigen Labs, Inc.*, 2011 U.S. Dist. LEXIS 13637 (N.D. Ga. 2011) (explaining how drugmakers use linkage databases to market their drugs to dispensers and other health care providers).
[65] 21 CFR § 314.3(b).
[66] Exhibit 24.

63.      Had Breckenridge disclosed its deviation from CGMP and USP requirements, Breckenridge could not have sold its adulterated drugs. Physicians would not have prescribed them, pharmacies would not have stocked and dispensed them, and patients would not have purchased them. They would instead purchase and consume Cymbalta or one of the many other unadulterated generic duloxetine products on the market.

64.      Breckenridge's adulterated drugs were worth zero dollars. Adulterated drugs must be incinerated, not sold for profit. Breckenridge must therefore reimburse purchasers who did not receive the benefit of their bargain.

65.      Breckenridge recognized that its adulterated duloxetine could not lawfully be sold when it issued a Class II recall for tens of millions of pills on April 29, 2024, citing its "CGMP Deviations" for violating the AI limits published by the FDA.

### *Estimated Damages*

66.      As set out above, the claims of Plaintiff and the Class are not necessarily limited to the duloxetine Breckenridge recalled but instead encompass the company's knowing or reckless sales of all duloxetine that was similarly adulterated due to CGMP and USP violations but was not recalled. The analysis here focuses on the recalled lots because there is no question that

those lots were adulterated—Breckenridge has admitted as much—and the approximate quantity of pills subject to the recalls is publicly available.

67.     To date, Breckenridge's recalls cover more than 69,000,000 individual tablets. Given the sheer size of the recall, the problem reflects systematic failures to carefully screen for the carcinogens in question, eliminate them from the manufacturing process, and prevent contaminated pills from reaching patients. In essence, the mass distribution of so much contaminated product reflects a deliberate choice to under-prioritize nitrosamine safety. The size of the recall also suggests that all product manufactured during the pertinent window may have been contaminated, although the full facts (including whether other lots are affected) lie in Breckenridge's manufacturing records.

68.     Without the benefit of discovery, damages are preliminarily estimated as follows. Online pharmacy data (GoodRx) for leading pharmacies (CVS, Walgreens) suggests a typical retail price of approximately $0.76–0.95 per tablet, varying based on dosage size and bottle volume. Assuming that there are "only" 69,000,000 tablets at issue, and every tablet sold at the low end of the price range (while being economically worthless), damages to the class would exceed $52,000,000.

## CLASS ALLEGATIONS

69.     Plaintiff seeks to represent the following class (the "Class"):

> All natural persons in the United States who purchased Breckenridge's duloxetine product that was recalled due to nitrosamine impurities or that similarly failed to meet the applicable CGMP or USP requirements but was not recalled.

70.    Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and any of its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

71.    All members of the Class have suffered a substantially similar injury: the purchase of a worthless, adulterated drug.

72.    Adulterated prescription medicine that cannot lawfully be sold can be considered "worthless" and allow the plaintiff to recover the full purchase price in damages.

73.    Subject to additional information obtained through further investigation and discovery, the definition of the Class may be revised as appropriate.

74.    *Numerosity.* The members of the Class are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable. Upon information and belief, Plaintiff reasonably

estimates that there are at least tens of thousands of members in the Class—and likely many more given that Breckenridge's recalls alone involved more than 69 million tablets. Although the precise number of members of the Class is unknown to Plaintiff, the true number of members of the Class may be determined through discovery, in particular through pharmacy dispensing records. Members of the Class may be notified of the pendency of this action by mail and/or electronic publication through the distribution records of Defendant, pharmacy benefits managers ("PBMs"), and other third-parties in the highly concentrated pharmaceutical distribution system.

75.    *Existence and predominance of common questions of law and fact.* Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members. These common legal and factual questions include, but are not limited to, the following:

> a.    whether the duloxetine pills at issue were adulterated due to unacceptable levels of nitrosamine impurities;
>
> b.    whether the duloxetine pills at issue failed to meet CGMP requirements;
>
> c.    whether the duloxetine pills at issue failed to meet USP requirements;

d.      whether Defendant knew or should have known that the duloxetine tablets were adulterated and failed to meet CGMP or USP requirements;

e.      whether Defendant recklessly disregarded that its adulterated duloxetine tablets failed to meet CGMP or USP requirements;

f.      whether adulterated and contaminated duloxetine is worthless;

g.      whether Breckenridge's representations regarding therapeutic equivalence with Cymbalta necessary for its Orange Book listing were false due to unacceptable levels of nitrosamine impurities;

h.      whether Breckenridge intended for its false representations to be transmitted throughout the pharmaceutical supply chain, including to end consumers;

i.      whether providers, pharmacists, and patients rely on Breckenridge's affirmative misrepresentations and omissions related to nitrosamine impurities, including its affirmative "USP" representation;

j.      whether the designation "USP" on the pill bottles at issue was false;

> k.    whether Breckenridge committed fraud; and
>
> l.    whether Plaintiff and the Class are entitled to damages and the proper measure for such damages.

76.    *Typicality.* Plaintiff's claims are typical of other members of the Class in that, among other things, all members of the Class were similarly situated and were comparably injured through Defendant's wrongful conduct. As explained above, each member of the Class suffered a substantially similar economic injury by purchasing Breckenridge's adulterated and worthless duloxetine pills. Further, there are no defenses available to Defendant that are unique to Plaintiff with respect to her economic damages claims.

77.    *Adequacy of Representation.* Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel that is experienced in complex consumer class action and product liability litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class. Furthermore, Plaintiff has no interests that are antagonistic to those of the Class.

78.    *Superiority.* A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The economic damages or other financial detriment suffered by individual members of the Class are relatively small compared to the burden and expense of individual litigation of their claims against Defendant. It would thus be virtually

impossible for the Class, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if members of the Class could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

## CAUSES OF ACTION

## COUNT 1: FRAUD

79.    The following tables summarize key aspects of Plaintiff's fraud count:

### Breckenridge's Fraudulent Statements

| Representation | Medium | Intended Direct Audience | False Because |
|---|---|---|---|
| Therapeutic equivalence to name-brand medication Cymbalta and | Orange Book; drug linkage databases | Drug linkage databases; pharmacy databases; third-party | Breckenridge duloxetine contains nitrosamine impurities at unacceptable levels |

| other listed generics | | payor databases | under CGMP, USP, and/or FDA AI limits |
|---|---|---|---|
| CGMP Compliance | Distributor and pharmacy contract specifications | Distributors; pharmacies | CGMP compliance requires control of nitrosamine impurities |
| USP Compliance | Bottle label, etc.; distributor and pharmacy contract specifications | Distributors; pharmacies; physicians; patients | USP compliance requires compliance with CGMPs and FDA AI level |

**Breckenridge's Fraudulent Omissions**

| Omission | Medium | Intended Direct Audience | False Impression Because |
|---|---|---|---|
| Breckenridge was not testing and releasing product pursuant to CGMP, USP, and FDA AIs | Commercial supply documents | Distributors; pharmacies | Commercial customers expect compliance with CGMP, USP, and FDA AIs |
| Breckenridge's testing showed or would have shown unacceptable levels of nitrosamine impurities | Commercial supply documents | Distributors; pharmacies | Commercial customers expect compliance with CGMP, USP, and FDA AIs |

80. In addition to Breckenridge's direct counterparties in the distribution chain, Breckenridge ultimately intended for patients and their prescribing physicians to receive and rely on Breckenridge's false representations. Because of the highly regulated and consolidated nature of the U.S. drug supply system, patients rely on the fact that drugs dispensed by pharmacies are required to and do in fact comply with the legal requirements

and customary expectations of that system—i.e., that the drugs are not adulterated, are interchangeable with the branded version, comply with CGMP and USP standards, and so on; in essence, that their medicine is safe and pure. Similarly, physicians take for granted that the generic medications they prescribe are non-adulterated, therapeutically equivalent to the branded version, and comply with CGMP and USP standards. When prescribing, dispensing, purchasing, and consuming prescription medicine, every participant in the chain of distribution down to the consumer relies on the medicine having the quality and purity that it is required to and purports to have.

81.    As a sophisticated manufacturer of generic drugs, Breckenridge is aware of those expectations and depends on them to compete for sales of its duloxetine. Breckenridge capitalizes on the trust that patients put in the drug supply system to deliver pure and safe medicines.

82.    Ms. Boyer purchased and ingested Breckenridge's contaminated duloxetine pills on the basis of that trust, as well as her own review of the product packaging and Breckenridge's express USP label claim.

83.    As a result of the compliance expectations described above and the broader problem of nitrosamine contamination extending back to at least 2018, Breckenridge knew that the company was required by the underlying CGMP and USP standards to control for nitrosamine impurities and ensure that its

drugs did not have nitrosamine impurities at an unacceptable level, including but not limited to complying with any AI limits published by the FDA. With respect to the contaminated lots at issue, Breckenridge either knew that they did not comply or willfully disregarded such knowledge by failing to adopt adequate testing and release protocols that would have prevented the manufacture, distribution, and sale of adulterated duloxetine. Breckenridge's disregard is especially problematic because the nitrosamine at issue is a product of Breckenridge's API, which is made by an affiliated company within the Towa enterprise. Breckenridge also knew that it lacked CGMP controls for nitrosamines and failed to disclose that deviation because it would have precluded the distribution and sale of its contaminated drugs.

84.    Breckenridge knowingly and falsely represented that the duloxetine pills at issue were USP-compliant. Breckenridge made this representation on each and every bottle of pills it sold and in related materials. Breckenridge likewise knowingly and falsely represented that the duloxetine pills at issue were CGMP-compliant, a representation Breckenridge made in its contract and specification documents with its direct customers. Breckenridge knowingly and falsely represented that the duloxetine pills at issue were therapeutically equivalent to its uncontaminated competitors, a representation Breckenridge made in its Orange Book listing and submissions to drug linkage databases and pharmacy databases.

85.    Breckenridge knew or should have known that its representations were false. As a drugmaker, Breckenridge is obligated to stay apprised of the latest science, FDA guidance documents, and related CGMP and USP requirements related to nitrosamine impurities. Beyond that, however, a research paper published by scientists at Breckenridge's parent company— Towa Pharmaceutical in Japan—shows that the enterprise was aware of both the risks of nitrosamine impurities and how to test for them. But despite closely related scientists writing a study on the topic, Breckenridge failed to adopt policies and procedures sufficient to ensure that it complied with FDA guidance and USP requirements, and it instead chose to sell adulterated drugs that failed to meet these requirements.

86.    Breckenridge's false representations were material. Given the well-accepted nature, acceptance, and statutory force of the USP, CGMP, and AI requirements, purchasers, such as pharmacies, would not purchase products for their inventory that are not compliant with applicable USP, CGMP, and AI requirements.

87.    Plaintiff, members of the Class, and their physicians and pharmacists were justified in relying on Breckenridge's representations, which Breckenridge knew and relied on in the distribution of its drugs. Drugmakers operate in a highly regulated environment, and everyone who touches the healthcare system depends on drugmakers to make accurate and honest

representations regarding the content, efficacy, and safety of their drugs. It was justified for purchasers, including consumers, to rely on the accuracy of express, factual representations that Breckenridge made on each bottle of its duloxetine pills and elsewhere.

88.     By making these false representations, Breckenridge intended for everyone in the distribution chain, including consumers, their physicians, and their pharmacists, to read and rely on its representations. Regardless of whether any individual consumer read these materials, however, Breckenridge knew and intended that physicians and pharmacists would rely on these fraudulent misrepresentations and that patients would be prescribed and purchase adulterated duloxetine pills as a result. By prescribing and dispensing Breckenridge's adulterated duloxetine, physicians and pharmacists unwittingly communicated Breckenridge's misrepresentations regarding CGMP and USP compliance to consumers, as Breckenridge intended. Plaintiff and all other consumers reasonably relied on the representations inherent in the transaction that the pills were or were equivalent to what their doctors prescribed and were of the necessary quality and purity to be dispensed by a pharmacist.

89.     Plaintiff anticipates seeking to prove the reliance element, on an indirect reliance theory, via common proof due to Breckenridge's uniform representations and the unique characteristics of the U.S. drug supply system.

The Class's reliance proof will focus on Breckenridge's uniform representations to a small number of commercial entities through which drugs must pass before they are sold to individual patients, who would not have made Breckenridge's adulterated duloxetine available for purchase by patients had Breckenridge not misrepresented the pills' status.

90.    As described above, unlike most consumer purchases, prescription drugs reach patients through a highly concentrated supply chain that depends on uniform representations of compliance with uniform quality and purity standards (here, CGMP and USP standards regulating the control and testing for impurities, as well as the FDA's AI limits). Virtually all prescription drugs in the U.S. are distributed and dispensed by a small number of companies who require compliance with USP and FDA standards. For instance, McKesson, AmerisourceBergen, and Cardinal Health collectively distribute nearly all the nation's prescription drugs, which are in turn dispensed by large pharmacy chains, dominated by national brands like CVS, Walgreens, and others. There are also only a few major linkage databases like Gold Standard and First Databank, who uniformly rely on a drug's listing in the Orange Book to link drugs as therapeutically equivalent. All those companies depend on drugmakers warranting and satisfying compliance with CGMP, USP, and other FDA purity standards. Ultimately, physicians and their patients depend on drugs they prescribe and take complying with those standards, given the

built-in requirement of the pharmaceutical distribution system that drugmakers are responsible for selling only compliant drugs.

91. But for Breckenridge's misrepresentations, the commercial entities in the chain of distribution would not have made the tablets at issue available for purchase by consumers. Breckenridge knew and capitalized on the efficacy of its uniform representations, which will allow the Class to prove indirect reliance on a common basis. *See, e.g.*, *Varacallo v. Mass. Mut. Ins. Co.*, 323 N.J. Super. 31, 47 (2000) (holding that common reliance may be "satisfied by proof of indirect reliance where a party deliberately makes false representations with the intent that they be communicated to others for the purpose of inducing the others to rely upon them") (cleaned up); *accord Restatement (Second) of Torts* § 533 (same).

92. Plaintiff and each member of the Class were damaged by Breckenridge's fraud: they overpaid for economically worthless, non-saleable drugs. *See*, *e.g.*, *Debernardis v. IQ Formulations, Ltd. Liab. Co.*, 942 F.3d 1076, 1084–85 (11th Cir. 2019) (holding that an "adulterated . . . product that Congress judged insufficiently safe for human ingestion" plausibly has "no value," and "[w]hen a plaintiff receives a worthless product, his benefit of the bargain damages will be equal to the entire purchase price of the product"); *see also Marrache v. Bacardi, U.S.A., Inc.*, 17 F.4th 1084, 1100-01 (11th Cir. 2021) (same); *Eli Lilly & Co. v. Air Express Int'l USA, Inc.*, 615 F.3d 1305, 1317 (11th

Cir. 2010) (holding that "the exposure to sub-freezing temperatures rendered [a drug product] worthless" because it became adulterated and therefore "unsaleable"); *United States v. Gonzalez-Alvarez*, 277 F.3d 73 (1st Cir. 2002) (defining the value of adulterated products as zero dollars for federal sentencing purposes); *United States v. Lane Labs-USA, Inc.*, 427 F.3d 219 (3d Cir. 2005) (holding that the courts can order restitution of the purchase price of adulterated goods).

93.     New Jersey law governs the fraud claims of Plaintiff and members of the Class regardless of where each person purchased the duloxetine pills. The choice-of-law analysis in this case is controlled by the Supreme Court of New Jersey's recent decision *In re Accutane Litigation*, 194 A.3d 503 (N.J. 2018).

94.     First, there is no outcome-determinative conflict between the law of New Jersey and the laws of Tennessee (Plaintiff's home state) or other states on the facts here. Breckenridge knowingly or recklessly made uniform, false representations to a consolidated pharmaceutical distribution chain with uniform expectations, intending to induce every link in the chain down to the patient level to rely on them. They all necessarily did, having no ability to verify the purity of Breckenridge's pills. Breckenridge made the same uniform representations of compliance directly to patients, who relied on the company to make medicine of the necessary and represented quality and purity. There

is no question that this reliance was reasonable; it is implausible to suggest that *any* consumer would ever knowingly purchase adulterated prescription medicine instead of non-adulterated medicine that is actually what their doctors prescribed and what their pharmacists intended to dispense. Every consumer purchased Breckenridge's medicine only because the company misrepresented its quality and purity, as the company intended. That is fraud. In the absence of a conflict, New Jersey law controls.

95.     To the extent the Court concludes that there could be a conflict between the law of New Jersey and some other state or states, New Jersey fraud law applies under *Accutane*. There, the state supreme court addressed choice-of-law in the context of consolidated products liability litigation in which the residents of 45 different jurisdictions (including New Jersey) brought claims against a New Jersey-based drug manufacturer. Even though *Accutane* involved personal injury claims under which there is a "presumption that the law of the state where the injury occurred applies," *id.* at 520, the state supreme court nevertheless held that "New Jersey has the most significant relationship to the occurrence and the parties," *id.* at 524.

96.     In *Accutane*, "the injuries caused by the [alleged conduct] occurred in forty-four other jurisdictions, but New Jersey is 'where the alleged conduct causing the injury occurred' – the manufacturing and labeling of Accutane." *Id.* at 521 (citation omitted). Further, the state supreme court considered the

"most significant *Restatement* factors" in a mass tort setting to be the "'certainty, predictability and uniformity of result'" and the "'ease in the determination and application of the law to be applied.'" *Id.* (quoting *Restatement (Second) of Conflict of Laws* § 6). "Applying a single standard to govern the adequacy of the label warnings in the 532 individual cases will ensure predictable and uniform results – rather than disparate outcomes among similarly situated plaintiffs . . . ." *Id.* at 523. Thus, in the aggregate setting where plaintiffs are in various states but bring claims related to conduct centralized in New Jersey against a New Jersey company, "New Jersey has the most significant relationship to the occurrence and the parties, overcoming the presumption that the law of the place of injury governs." *Id.*

97.    Here, the analysis in *Accutane* points even more strongly to the uniform application of New Jersey law. Because this is not a personal injury case and the class seeks only economic damages, there is no baseline presumption that the law of the state of injury should apply to each plaintiff, and it is therefore not necessary to overcome such a presumption to apply New Jersey law. *Compare Restatement (Second) of Conflict of Laws* § 146 (establishing presumption in "personal injury" cases that "the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the

occurrence and the parties"), *with Restatement (Second) of Conflict of Laws* § 148 (establishing various factors in "fraud and misrepresentation" cases to determine "the most significant relationship" where "the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made").

98.     While there is no baseline presumption pointing away from New Jersey to overcome in this fraud case, the considerations that the *Accutane* court considered sufficient to overcome the presumption in that case and find that New Jersey had the most significant relationship apply with equal force here. Therefore, New Jersey law controls the fraud claims of Plaintiff and the Class regardless of where Breckenridge's adulterated duloxetine was sold. To the extent that decisions that predate or fail to address *Accutane* have taken different approaches or reached different conclusions, those decisions are no longer good law.

99.     Applying New Jersey law to all claims against Breckenridge raises no Due Process concerns. Breckenridge is a New Jersey drugmaker, it appears that much or all of its US-based conduct related to the claims at issue took place in New Jersey, and Breckenridge has every reason to expect that it is subject to New Jersey law. *See McCarrell v. Hoffmann-La Roche, Inc.*, 153 A.3d 207, 211 (N.J. 2017) ("Our jurisprudence has long recognized that this State

has a substantial interest in deterring its manufacturers from placing dangerous products in the stream of commerce.").

100.    Plaintiff and the Class seek to recover the full purchase price of all recalled or otherwise adulterated duloxetine medication sold by Breckenridge in the United States. These damages include both the consumers' out-of-pocket payments and any amounts paid by the consumers' insurers, which are recoverable under New Jersey's traditional collateral source rule. *See Emilien v. Stull Techs. Corp.*, 70 F. App'x 635, 642-43 (3d Cir. 2003) ("While the rule has been modified by statute, the modification applies only to civil actions for personal injury or death.") (distinguishing N.J.S.A. 2A:15-97).

## COUNT 2: NEW JERSEY CONSUMER FRAUD ACT

101.    In addition to constituting common law fraud, Breckenridge's false representation of the products at issue as USP- and CGMP-compliant violated the New Jersey Consumer Fraud Act ("NJCFA"). *See* N.J. Stat. § 56:8-1 *et seq.*

102.    Under the NJCFA, it is an "unlawful practice" to use "any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate . . . ." N.J. Stat. § 56:8-2.

103.    The representations identified in the above tables are similarly actionable under the NJCFA.

104.    Breckenridge intended for purchasers throughout the distribution chain, including Plaintiff and the Class, to rely on its affirmative misrepresentations.

105.    In addition to its affirmative misrepresentation of USP and CGMP compliance, Breckenridge knowingly concealed, suppressed, or omitted the material fact that the products at issue were adulterated and contaminated with unacceptable levels of nitrosamine impurities. It was unconscionable for Breckenridge to conceal that its prescription medication contained carcinogens at unacceptable levels. Breckenridge's knowledge of both the risks caused by nitrosamine contamination and the need to test for nitrosamine impurities is shown, among other things, by the research paper published on precisely these topics by scientists at Breckenridge's parent company in Japan, Towa Pharmaceuticals. But Breckenridge nevertheless chose to sell adulterated medicine to the public.

106.    Under the NJCFA, "[a]ny person violating the provisions of the within act shall be liable for a refund of all moneys acquired by means of any practice declared herein to be unlawful," N.J. Stat. § 56:8-2.11, and "[t]he refund of moneys herein provided for may be recovered in a private action," N.J. Stat. § 56:8-2.12.

107.    Further, "[a]ny person who suffers an ascertainable loss of moneys or property" due to a violation of the statute is entitled to an "award [of] threefold the damages sustained." N.J. Stat. § 56:8-19. The NJCFA also provides that "the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit." *Id.*

108.    As set out above, Breckenridge's recalled or otherwise adulterated duloxetine pills were economically worthless and could not have been sold had Breckenridge disclosed the nitrosamine contamination rather than concealing it. Plaintiff and members of the Class therefore suffered ascertainable damages in the full purchase price of the products at issue.

109.    Plaintiff and the Class seek to recover treble damages, attorneys' fees, and costs under the NJCFA for all of Breckenridge's sales of the affected products nationwide. For the same reasons set out in Count One, the New Jersey Supreme Court's recent decision in *Accutane* controls. The state supreme court's holding there addressed a New Jersey statute that was in direct conflict with the equivalent state statutes of many of the forty-four other jurisdictions in which plaintiffs had been injured. The Supreme Court of New Jersey nevertheless applied New Jersey's statutory law to all claims in that action, despite the presumption that the law of the state of injury generally applies in personal injury actions. As set out in Count One, there is even more reason to apply New Jersey law uniformly in this consumer fraud case dealing

with false, uniform representations used to sell prescription drugs distributed by a New Jersey drugmaker out of New Jersey.

## PRAYER FOR RELIEF

Plaintiff and the Class respectfully request the following relief:

    a.    Compensatory damages in an amount to be determined at trial;

    b.    Treble damages under the NJCFA;

    c.    Costs and attorneys' fees;

    d.    Pre- and post-judgment interest; and

    e.    All other appropriate relief.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to Local Civil Rule 11.2, undersigned counsel for plaintiff hereby certifies that the matter in controversy here is not the subject of any action pending in any other court, arbitration, or administrative proceeding.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1

Pursuant to Local Civil Rule 201.1, undersigned counsel for plaintiff hereby certifies that this action is excluded from compulsory arbitration because the monetary demand exceeds $150,000, exclusive of interest and costs and any claim for punitive damages.

Dated: September 10, 2024

**ANDERSON & SHAH, LLC**
*Attorneys for Plaintiff Sheryl Boyer,*
*on behalf of herself and all others*
*similarly situated*

By: */s/Roshan D. Shah*
    Roshan D. Shah, Esq.

**THE BLOCK FIRM LLC**
*Attorneys for Plaintiff Sheryl Boyer,*
*on behalf of herself and all others*
*similarly situated*

By: */s/Aaron K. Block*\*
    Aaron K. Block

\*  *pro hac vice* admission
   forthcoming